UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

UNITED STATES OF AMERICA,

                                                      S21 04 Cr. 801 (PKC)

        -against-                              MEMORANDUM
                                                     AND
MARK BROWN, et al.,                      ORDER

                Defendants.
-----------------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.

        This is a motion for a new trial by defendants Bobby Weston, Conrad Cooper, Sheldon Fuller and Enrico Thomas. Cooper, Fuller, and Thomas were convicted of engaging in a racketeering enterprise and membership in a conspiracy to violate the racketeering laws. The three were also convicted of various crimes associated with the lying-in-wait, double murders of Rohan Bailey and Camila Simmonds.[1] Cooper, Fuller, Thomas and Weston were convicted of conspiracy to distribute and possession with intent to distribute marijuana and each were found to have been responsible for 1,000 kilograms or more of marijuana. A motion for a new trial by defendant Weston and three other defendants who have not joined in this motion was previously denied. United States v. Brown, No. 04 CR 801 PKC, 2006 WL 2724025, at *6-*14 (S.D.N.Y. Sept. 22, 2006).

        While Weston asserts various additional grounds that are unique to him, all moving defendants assert that the they are entitled to a new trial or an evidentiary hearing in support of a new trial because it has come to light that one of several government co-conspirator witnesses, Stephen Mattis, known as "Rockpeck," was not truthful when he testi-

---

[1] Violent crimes in aid of racketeering: murder of Bailey and Simmonds (Counts 5 and 6); murdering or aiding and abetting the murders of Bailey and Simmonds in connection with narcotics trafficking (Count 7 and 8); using, carrying or possessing a firearm in connection with a drug trafficking crime (Count 9); murder of Bailey and Simmonds through the use of a firearm (Count 10).

fied at trial that he had ceased his involvement with drug trafficking. Also, when Mattis was asked in proffer sessions about the whereabouts of a co-conspirator, he did not disclose what he knew on the subject.

For the reasons discussed herein, I conclude that the defendants have failed to come forward with any evidence to undermine the government's factual showing that, at the time of trial, members of the prosecution team did not know, nor should they have known, of Mattis's continuation of illicit activities. Moreover, there is no basis to conclude that but for Mattis's perjured testimony the defendants would not have been convicted. No hearing is necessary and no new trial is warranted. As explained below, Weston's motion for a new trial premised upon the affidavit of Obesia Phillips is also denied, as is his challenge to the sufficiency of the evidence before the grand jury.

<u>The False Testimony of Mattis' About Ending his Drug Trafficking Activities</u>

Mattis was named in a superseding indictment filed on September 30, 2004 (S5), along with six others. An arrest warrant was issued the same day. His initial presentment before the Magistrate Judge occurred on December 15, 2004. Mattis attended several proffer sessions with the government in aid of a cooperation agreement. Pursuant to the terms of a plea which contemplated a substantial assistance motion by the government, Mattis pleaded guilty on September 15, 2005 to a single-count information charging him with participating in the operation and management of a racketeering enterprise. Sentencing was deferred until after his cooperation was complete.

According to a Special Agent of the Drug Enforcement Administration, Matthew Martin, known as "Blacks," was arrested in May 2006 in connection with the same drug trafficking activities that were charged in the indictment that proceeded to trial. Martin revealed that, commencing about three months after Mattis was arrested and continuing up to

the time of Martin's arrest, Mattis spoke with Martin on the telephone approximately 6 times. Mattis reported to Martin that he was owed $130,000 in drug-related money by "Driver." Martin collected about $19,000 in cash from Driver. Martin used $10,000 of this money to buy 800 pounds of marijuana in Arizona for resale by Mattis and himself. Portions of the proceeds were paid by Martin to Mattis's wife, his lawyer and his jail commissary account.

On April 14, 2007, the government disclosed to defense counsel and the Court that Mattis had breached his plea agreement by accepting receipt of narcotics proceeds and failing to disclose the whereabouts of Martin, despite questions during debriefings on Martin's location.

The government declined to make a substantial assistance motion with respect to Mattis. On April 8, 2008, Mattis was sentenced by this Court. In the course of the sentencing proceeding, this Court made a finding that Mattis had been untruthful when he testified at trial that he had ended his involvement in the marijuana business. At trial, Mattis had testified as follows:

> Q. When did you stop being involved in the business of dealing in marijuana?
> A. When I was---when I was?
> Q. When did you stop being involved in the business of marijuana?
> A. When I was stopped being involved?
> THE COURT: When did you stop?
> THE WITNESS: 2004, 14th of December, when I was arrested.

(Trial Tr. 654.)

At the sentencing hearing, Mattis did not dispute that between December 14, 2004, the date of his arrest, and March 15, 2006, the date he gave the foregoing testimony, he had conversations with Martin regarding the collection of the $131,000 of "buy money" from Driver. (Mattis Sentencing Tr. 14-15.) The government also asserted its belief that, on Mattis's instruction, portions of the money recovered by Martin were used or would

have been used to purchase additional marijuana for sale. (Id. 14.) In proffer sessions, Mattis had admitted knowing Blacks, but denied knowing his whereabouts. The government asserted, but Mattis disputed, that he had an obligation to come forward with subsequently acquired information on the subject.

At Mattis's sentencing, this Court concluded that his testimony at trial on the issue of cessation of drug activity was knowingly false and not the product of a failure of recollection or misunderstanding of the question. (Id. 15.) Based upon this false testimony, the Court enhanced the Guideline offense level by two for obstruction of justice and denied Mattis a downward adjustment for acceptance of responsibility. (Id.) He was sentenced principally to 235 months' imprisonment, the bottom of the Guideline range. (Id.)

Is a Hearing or New Trial Warranted Based Upon Mattis's False Testimony?

   A. The Absence of a Sufficient Factual Basis to Warrant a
      Hearing on the Prosecutor's Knowledge of the Perjury.

The moving defendants seek an evidentiary hearing in support of their motion in order to explore the prosecution team's knowledge of the falsity of Mattis's trial testimony and to learn more about the scope of Mattis's continued drug-trafficking activities. "Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). If the government knew or should have known of the perjury, then a new trial will be granted "'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Id. (quoting Perkins v. LeFevre, 691 F.2d 616, 619 (2d Cir. 1982) (additional citations omitted)). If the government knew of the perjury, reversal is "'virtually automatic.'" Id. (quoting United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975)).

For the purposes of this analysis, I assume that Mattis's testimony was material. As outlined below, it covered much of the same ground as several other witnesses, but it was relevant probative testimony in support of the government's case-in-chief. It was not immaterial, insubstantial or collateral to the charges in the indictment.

Here, the government has come forward with declarations from four prosecutors assigned to the case: the three members of the trial team and the lead assistant who has been in charge of the prosecution of this drug enterprise and conspiracy since May of 2003. Each declares under penalty of perjury that he or she had no knowledge of Mattis's covert contact with Martin at the time of Mattis's trial testimony. While flat-out denials by members of the prosecution team are not necessarily dispositive, there are no surrounding facts or circumstances which cast doubt upon their assertions. Nor, for reasons to be explained, do the facts suggest that any member of the prosecution team should have known of the perjury.

Martin was the source of the government's information that Mattis had falsely claimed to have ended his drug trafficking involvement. Martin, however, was not arrested until after Mattis had testified and the verdicts were returned. The government did not know what Martin knew at the time of Mattis's testimony. Nor did the government consciously avoid learning Martin's whereabouts. It made inquiry of Mattis, who denied knowing his location. Mattis covered his tracks by telephoning his wife but secretly arranging to have Martin present with his wife for the call. There is no evidence (and no reason to suspect) that the government allowed (or would allow) Martin to remain at large as part of a grand effort to hide the falsity of Mattis's assertion that he had ended his drug trafficking or any other portion of his testimony.

There was no strategic advantage to the government from Mattis's deceit. As outlined below, it had other credible cooperators who could and did cover the same ground as

Mattis. An unethical prosecutor blinded by a desire to obtain a conviction at the expense of the integrity of the process would have had a weak motive or, perhaps, no motive to present a single, perjurious witness whose testimony was largely cumulative of the testimony of others.

Defendants have come forward with no facts which, if proven at a hearing, would demonstrate that the government knew or should have known that Mattis's testimony was false. Rather, the hearing is sought principally with the hope that the defendants can prove that the prosecutor's denials are false. Nor have defendants demonstrated that a more fulsome exploration of the extent of Mattis's post-arrest interactions with Martin would lead to anything of material significance to a disposition of this motion. The movants have made an insufficient showing to warrant an evidentiary hearing and their application for a hearing is denied.[2]

On the totality of circumstances, this Court concludes that there is no evidence that the government knew or should have known of Mattis's deceit prior to Mattis's trial testimony.

  B.  Standard for A New Trial In the Absence of the Government's Knowledge

"Where the government was unaware of a witness' perjury, . . . a new trial is warranted only if the testimony was material and "'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" Wallach, 935 F.2d at 456 (quoting Sanders v. Sullivan, 863 F.2d 218, 226 (2d Cir. 1988) (alteration in Wallach)). "The test 'is whether there was a significant chance that this added item, developed by skilled counsel . . . could have induced a reasonable doubt in the minds of

---

[2] On a suppression motion, an evidentiary hearing is required only "if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992) (citation omitted). No reason is tendered why a lesser standard ought to apply on this motion.

enough of the jurors to avoid a conviction.'" Wallach, 935 F.2d at 456 (quoting United States v. Seijo, 514 F.2d 1357, 1364 (2d Cir. 1975)).

Here, the defendants do not mount a serious attack on the convictions under this prong. I presided at the trial and am familiar with the trial testimony. I will briefly review the trial testimony of cooperating witnesses relating to these four defendants. From a review, this Court comfortably concludes that there is no reasonable basis to believe that the verdicts in this case would have been different without the testimony of Mattis.

Donald Morrison, known as "'Pone," a shortened form of "Al Capone", described his involvement in the drug enterprise. (Trial Tr. 132.) He conducted the marijuana business with Weston, Thomas (Rico), Fuller, Cooper (Dirvin) and others. (Id. 132-35.) Morrison described how he began traveling to Tucson, Arizona in 2000 and helped ship the marijuana from there to Ossining, New York. (Id. 148.) He described how the business evolved into a trucking operation. (Id. 159-61.) He saw Mattis, known as "Peck" or "Rockpeck" along with Cooper, Thomas, Weston and others at "Tommy's" house in Tucson. (Id. 162-63.) He described how over 1,000 pounds of marijuana were purchased from Mexican suppliers and brought by van to Tommy's house. (Id. 166.) He described the wrapping and packaging operation. (Id. 168-69.) He described how the packaged marijuana was driven from Tommy's house to meet and load a tractor-trailer. (Id. 171-72.) Morrison saw Fuller in Tucson wrapping marijuana in connection with a subsequent shipment to New York. (Id. 175.) He testified that his uncle ran a truckload of marijuana from Tucson to New York and that Mattis, Weston, Thomas and Cooper each had a segment of the shipment. (Id. 194-95.)

Morrison testified that he discussed the double homicide of Bailey and Simmonds with Fuller, Cooper, Thomas and others. (Id. 180.) He spoke to Cooper about the killings on about seven or eight occasions. (Id. 181.) Cooper told Morrison that he, Fuller,

Thomas and two others were in the apartment on the night of the double homicide. (Id. 189.) Cooper told Morrison that Fuller was among the shooters. (Id. 190.) Thomas also spoke to Morrison about the double homicide and Thomas told him that he and Cooper were in the apartment. (Id. 191.) He also spoke with Fuller about the killings. (Id.) Fuller said that he fired at one or more of the victims. (Id.)

Tedane Muir testified to his involvement in the enterprise and his trips to Arizona to purchase marijuana. (Id. 440.) He testified that he was in the marijuana business with Thomas, Fuller, Cooper and Weston, all of whom he identified in court. (Id. 441-43.) He was in a house in Tucson with Thomas and others preparing the marijuana for shipment; there was a "bust" and Muir and Thomas were arrested. (Id. 440.) Cooper, on one occasion, gave him a .22 caliber pistol for safekeeping. (Id. 448.) He sold marijuana from an apartment at the Dunbar in upper Manhattan with Thomas and Cooper and others. (Id. 450.) He traveled to Arizona with Cooper and Thomas and others in July 2001 to prepare 600 pounds of marijuana for shipment to New York on a tractor-trailer. (Id. 454-55.) Cooper, Thomas, Mattis and others owned portions of the shipment. (Id. 457.) In New York, Thomas and Cooper assisted in bringing marijuana up to the apartment at the Dunbar. (Id. 458.) Muir testified to a truckload shipment involving Thomas and Cooper in February 2002. (Id. 472-73.) Bobby Weston, who Morrison knew as a friend of Mattis, assisted in the shipment operations. (Id. 481-82; 487.) Weston, Mattis, Thomas, Cooper and others were in Arizona in November 2002 to assist in the loading of a truck with marijuana. (Id. 487.) Weston, Mattis, Thomas, Cooper and others were also in Arizona to prepare a New York-bound shipment in December 2002. (Id. 488.) Morrison observed Fuller visiting the apartment at the Dunbar on two occasions to pick up five-pound quantities of marijuana from Mattis. (Id. 490.) He also testified to a 1,000-pound marijuana loading trip to Arizona with Fuller, Thomas, Cooper and

others in early 2003. (Id. 491-92.) In March or April of 2003, he returned to Arizona on a 1,000-pound purchasing trip with Thomas, Cooper and others and stayed at Bobby Weston's house in Arizona. (Id. 493.) He testified to similar shipments in July 2003 involving Weston, Thomas, Mattis, Cooper and others, (id. 494), and shipments in September 2003, February 2004, April 2004, and May 2004 involving Cooper, Thomas, Mattis and others, (id. 494-98). He testified to other trips involving Cooper and Thomas. (Id. 494-98.) Muir identified the voices of Thomas and Cooper on an intercepted call in which they were discussing drug buys with their Mexican supplier, "Mommy." (Id. 507.)

Muir also testified that Thomas told him that he, Cooper and Fuller were in the apartment at the time of the double homicide at the Dunbar. (Id. 515-16.) Thomas told Muir that Fuller and "Dog" were the shooters. (Id. 517.) Cooper told Muir that he had opened the door for the victims. (Id. 516.) Fuller told Muir that the victims were surprised when they were staring down the muzzle of a gun and tried to escape; Fuller said he fired shots at the victims and then ran to the roof. (Id. 519.)

Boyd Campbell testified to his involvement in the enterprise. He made an in-court identification of Thomas, Cooper, Fuller and Weston. (Id. 2171-74). He also placed Thomas and Cooper in the Arizona packaging operation. (Id. 2208-09.) He wrapped marijuana at Thomas's house in Arizona where he saw Cooper, Weston and others. (Id. 2213-14; 2219-20.) He placed Thomas and Cooper in the unloading process at the Dunbar in New York. (Id. 2211.) He was scheduled to meet a drug shipment at a truck stop in Mahwah, New Jersey, but the shipment was seized and Campbell fled. (Id. 2223.) He spoke to Weston, Fuller and Thomas about the seizure shortly after it occurred. (Id. 2224-25.)

Kevon Holt, also known as "Dog", identified Cooper, Thomas and Fuller. (Id. 858-60.) He testified that he bought marijuana from Thomas on one occasion. (Id. 861.) He

described the background and motive for the double homicide at the Dunbar. (Id. 916-27.) He testified that on December 18, he, together with Capleton, Jolly, Bus Boy, Fuller, Thomas and Cooper were present in an apartment at the Dunbar. Fuller and Capleton came up with a plan for the execution of Boy Blue and Junior, the two victims. (Id. 931.) Jolly would be at the back window, Capleton and Thomas in the kitchen looking out the window, Fuller and Holt would be in the living room and Cooper would be at the door. (Id. 931-32.) On December 19, Capleton, Jolly, Fuller, Thomas, Cooper and Holt were in the second-floor apartment at the Dunbar. (Id. 932.) Boy Blue and Junior showed up at the building and rang the bell and were buzzed in by Cooper. (Id. 932-33.) Holt had a .357 Magnum, Jolly had a .38, Capleton had a 9, Fuller had a Tech 9 and Thomas had a .45. (Id. 933.) Thomas and Capleton were in the kitchen; Holt was crouched down and Fuller was standing over him, both directly in front of the door; Holt gave the direction to Cooper to open the door. (Id. 935-36.) Holt laughed and then fired six shots at Junior; Fuller walked out of the apartment and squeezed a few rounds into Junior and then shot Boy Blue in the head. (Id. 936-37.) Thomas later told Holt that he fired one or more shots through the door of the downstairs lobby in case Boy Blue or Junior were coming through the door. (Id. 949.) Cooper told Holt that he left the apartment after the shooting. (Id.)

It is in this context that the testimony of Mattis should be considered. Mattis admitted to his illegal presence in this country and his participation in the business of dealing marijuana between 1999 and 2004. (Id. 653-54.) He identified Cooper, Thomas, Fuller and Weston as among those with whom he engaged in drug trafficking. (Id. 655-58.) He testified that he was a frequent user of marijuana, smoking as many as four or five times a day. (Id. 665.) He sold marijuana out of Dunbar in one-pound-or-less quantities. (Id. 667.) Mattis, at times, would transport as much as 20-pound packages of marijuana to the Dunbar. (Id.

669-70.) Mattis would sell marijuana for his own account or for others. (Id. 672.) Towards the last part of 2000, Mattis, together with Cooper, Thomas and others, was selling 50 to 60 pounds of marijuana out of the Dunbar. (Id. 676.) Towards the end of 2000 and into 2001, the marijuana was brought in from Arizona. (Id. 676-78.) Mattis traveled to Arizona to obtain marijuana with Cooper and Thomas and others. (Id. 685.) On one trip, he participated in the wrapping and packaging of 300 to 400 pounds of marijuana and efforts to disguise its odor. (Id. 686.) Some of this marijuana was sold from the Dunbar by Cooper and Thomas (Id. 688.) In April 2001, he, together with Cooper, Thomas and others, helped assemble and pack marijuana in Arizona for shipment to New York; the shipment was seized. (Id. 689-90.) He testified to other truckload shipments from Arizona in which Cooper or Thomas had a role. (Id. 694-95.) Mattis testified that he sold between 5 and 10 pounds of marijuana from a 2002 shipment to Fuller. (Id. 699.) Mattis identified the voices of Cooper and Thomas on an intercepted recording of a conversation with a Mexican marijuana supplier. (Id. 730.)

He testified that in 2002, he knew Bobby Weston because they both lived in Ossining, New York. (Id. 702.) According to Mattis, during 2003, Weston had between 50 and 100 pounds of marijuana on trucks from Arizona. (Id. 703; 709-10.) Weston had marijuana on trucks from Arizona on three or four occasions. (Id. 709.)

As the foregoing demonstrates, Mattis was not an indispensable component of the case against any of the four defendants. He, unlike Kevon Holt, was not present during the double homicide. There was also physical evidence, such as the autopsy report, that supported Holt's account of the murders. Thomas, Cooper and Fuller made admissions about the double homicide to Morrison and Muir. Weston's participation in the drug conspiracy was testified to by Morrison, Muir and Campbell. There was no significant chance that there would have been a reasonable doubt if the government's case did not include Mattis.

Weston's Motion for a New Trial

Defendant Weston, known as "Badness," also moves for a new trial on the ground of newly discovered evidence. Rule 33(a), Fed. R. Crim. P. ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.") Specifically, Weston has presented the affidavit of Obesia Phillips who, from October 2002 to January or early February of 2003, lived with Weston in a one-bedroom apartment in Tucson, Arizona. Ms. Phillips states that, had 1,000 pounds of marijuana been delivered to the apartment, it could not have escaped her attention due to the location and size of the apartment. Ms. Phillips, who ended her relationship with Weston in January or February of 2003, moved to Florida and did not come forward sooner because she did not know of his arrest. A floor diagram shows the apartment to be 688 square feet.

"A new trial pursuant to Rule 33 based on newly discovered evidence may be granted 'only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal.'" United States v. Owen, 500 F.3d 83, 87 (2d Cir. 2007) (quoting United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980)). "Motions for new trials based on newly discovered evidence 'are not held in great favor . . . .'" United States v. Slutsky, 514 F.2d 1222, 1225 (2d Cir. 1975) (quoting United States v. Catalano, 491 F.2d 268, 274 (2d Cir. 1974)). "To succeed on such a motion a defendant must show, inter alia, (1) that the evidence was discovered after trial, (2) that it could not, with the exercise of due diligence, have been discovered sooner, (3) that it is so material that it would probably produce a different verdict." Slutsky, 514 F.2d at 1225 (citing United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958)). The evidence may not be merely impeaching or cumulative. Owen, 500 F.3d at 88.

For the purposes of this motion, this Court accepts Ms. Phillips's statement that she was unaware of Weston's arrest and Weston's statement that he did not know her whereabouts as of the time of trial. This Court accepts the proposition that Ms. Phillips could not have been found with the exercise of diligence and that her statements are newly discovered evidence. However, Ms. Phillips's testimony would not likely have led to a different outcome at trial. If it had the significance which defendant ascribes to it (undermining Muir's testimony that co-conspirators packaged marijuana at Weston's home), it would have been no more than impeachment evidence. However, the affidavit of Ms. Phillips does not, in fact, contradict the testimony of Muir. Nor does it undermine the testimony of Morrison or Campbell.

Muir testified to a trip to Arizona in or around November 2002 at which Muir and others, including Weston, bought, packaged and loaded over 1,000 pounds of marijuana. (Id. 486-87.) When the marijuana arrived by truck in Manhattan, Weston and others shared the contents. (Id.) Muir went back to Arizona in December 2002 and Weston, with others, purchased about 2,000 pounds of marijuana. Muir testified that he stayed at Thomas's apartment, but did not indicate where the marijuana was packaged. (Id. 488-89.) In the time period of February or March of 2003, another 1,000 pounds of marijuana were acquired, packaged at an unspecified location and loaded on a truck with the participation of Weston. (Id. 492.) In or about March or April, 2003 there was yet another trip to Arizona by Muir at which a group consisting of Muir and eight others stayed with Weston at "Bobby's house." (Id. 493.) Over 1,000 pounds of marijuana were bought and loaded for transport. (Id. 493-94.)

There was no testimony from Muir that anyone engaged in a packaging operation at Weston's home at any point from October 2002 through February 2003, the period of

Phillips's shared occupancy. As noted, Muir did testify that he and eight others stayed at Weston's "house" in March or April, 2003, a time period not included within the knowledge of Ms. Phillips. Weston may have moved to a new location in Tucson after February 2003; Muir's testimony does not speak to the subject.[3] Indeed, Muir does not state that the packaging operation took place at Weston's home but merely that "[w]e stayed in Bobby's house." (Id.) Ms. Phillips was not in Tucson in March or April 2003 and her affidavit does not speak to activities that may have transpired at Weston's then place of residence.

Apart from Muir's testimony, Morrison also placed Weston in the heart of the marijuana conspiracy. (Id. 162-63; 194-95.) Campbell placed Weston in a 1,000 to 1,200 pound packaging operation at Thomas's home in Tucson in December 2002. (Tr. 2219-20.)[4]

The newly discovered evidence does not warrant a new trial.

Grand Jury

Defendant Weston's present counsel, who was not trial counsel, argues that "[i]f Weston's name was simply added to the indictment or if the grand jury indicted him and others without having heard any evidence at all, the district court was deprived of jurisdiction." (Weston Reply Mem. 11.)

The government has furnished the Court and defense counsel with the transcript of NYPD Detective Christopher Killen (originally produced to Weston's trial counsel as 3500 material). Killen testified to information he had received from a cooperating witness

---

[3] Ms. Phillips's phraseology that "[w]e vacated the apartment in January or February, 2003 and I moved to Florida at which time Bobby Weston and I stopped seeing each other" is read by defense counsel to exclude the possibility that Weston remained in the apartment (emphasis added). Weston, who did not take the witness stand at trial, has submitted his own affidavit confirming that he vacated the apartment in January or February 2003 and returned to New York. He does not state where he was living in March or April 2003. Certainly, his own statements do not qualify as newly discovered evidence. That said, neither affidavit excludes a range of other possibilities, including that Weston rented another location in Tucson.

[4] Weston's use of the date stamps in his own passport to impeach Campbell's chronology is not premised upon newly discovered evidence.

concerning Weston's involvement in multiple shipments of marijuana in-excess-of-1,000 pounds from Tucson to New York. (Grand Jury Tr. 6.) Specifically, Killen recounted that the witness had told him that Weston had 100 pounds of the in-excess-of-500 pounds of marijuana on a truck shipment that was seized in January 2003. (Id. at 7.) The testimony amply supported the indictment of Weston.

Conclusion

>The motions of defendants Weston, Cooper, Fuller and Thomas are denied.

>SO ORDERED.

>P. Kevin Castel
>United States District Judge

Dated: New York, New York
    May 28, 2008